UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| KELLY C. ROTHROCK, § | |
| § | |
| Plaintiff, § | |
| VS. § | CIVIL ACTION NO. 3:12-CV-241 |
| § | |
| JOSEPH GORMAN, *et al*, § | |
| § | |
| Defendants. § | |

**OPINION AND ORDER**

Pending before the Court is Defendants City of Texas City, Texas and Joseph Gorman's ("City") Motion for Summary Judgment (Doc. 45) and Plaintiff's ("Rothrock") Response (Doc. 46). Having considered the motion, the response, the facts in the record, and the applicable law, the Court concludes that the motion should be granted.

**I.     Background**

This is a retaliation action under Sections 1981 and 1983 of the Civil Rights Act of 1866. 42 U.S.C. §§ 1981, 1983; Doc. 21 at 4 ¶ 16. Kelly Rothrock is an African American female. She was a firefighter for the City of Texas City from June 2001 until her termination in October 2008. Prior to termination she filed an EEOC complaint on March 7, 2005 against the International Association of Fire Fighters Local Union 1259 alleging race and sex discrimination. Doc 45-7 at 50. The EEOC conducted an investigation and dismissed the charge on August 25, 2005. Doc. 45-7 at 51. On June 3, 2008, Rothrock filed an EEOC complaint against the Texas City Fire Department alleging discrimination and retaliation. Doc. 45-7 at 52. On the same day, she had been issued a Notice of Indefinite Suspension (Termination) for failure to file incident reports and lying about it and for excessive and inappropriate use of a Fire Department phone and vehicle. Doc. 45-10 at 58. Rothrock accepted a 30-day suspension in lieu

of termination, waiving her right to appeal. Doc. 45-10. In her acceptance letter, she states she "expressly denies all allegations" and "believes that Chief Gorman's investigation and decision are further evidence of retaliation against Captain Rothrock for exercising her rights under Title VII of the Civil Rights Act of 1964, as amended." *Id.* The EEOC conducted an investigation and dismissed her complaint on June 23, 2010, 45-7 at 56.

Rothrock made numerous informal complaints about the behavior of other firefighters. Doc. 45-8 at 4; 45-7 at 12; 46-8; 46-12; 46-14; 46-18; 46-24; 47-17; 47-18; 47-19; 48-3; 48-5; *see* Doc. 46 at 66 (Plaintiff alleges she "wrote so many email, letters, and complaints she could probably be considered a pest."). In 2007, the City agreed to Rothrock's request to hire an outside investigator to investigate complaints by and against her. Doc. 45-14 at 3. The investigator found no evidence of racial discrimination. *Id.* Rothrock did not appeal its conclusions. Doc. 45-14 at 3; *see* EEOC Intake Form, Doc. 45-3 at 65 ("I was satisfied with the outcome of the investigation but now I am up for termination"). In February 2008, the City retained an investigator, an employment attorney, to investigate Rothrock's complaints. Doc. 45-8 at 5. The investigation was closed when Rothrock did not cooperate. Doc. 45-8 at 5; 45-15 at 2.

On October 3, 2008, Rothrock was terminated for failure to establish command of the scene of a grass fire, failure to control and extinguish the fire, and leaving the scene of the fire without transferring command. Doc. 45-8 at 9. On October 10, 2008, she was terminated on separate grounds for failure to obey orders and to comply with a legal subpoena to appear at a proceeding which she had initiated by bringing a complaint against another firefighter. Doc. 45-8 at 10. On October 15, 2008, she was terminated a third time for insubordination and failure to comply with an investigation arising from her usage of extended sick leave. Doc. 45-8 at 11.

Plaintiff elected to appeal her termination before the Civil Service Commissioner. Doc.

45-34. She filed suit against Texas City in state court on September 15, 2010. Doc. 36-1. On March 12, 2012, she nonsuited the case and filed a federal suit in the Galveston Division before Judge Gregg Costa on April 20, 2012. On January 14, 2013, Judge Costa denied a motion to dismiss under the Statute of Limitations. Doc. 29. On June 9, 2014, the case was reassigned to this Court. Doc. 60.

## II. Legal Standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over such a fact is genuine if the evidence presents an issue "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Initially the moving party bears the burden of identifying evidence that no genuine issue of material fact exists, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmovant bears the burden of proof at trial, the movant need only point to the absence of evidence supporting an essential element of the nonmovant's case; it does not have to support its motion with evidence negating the case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The nonmovant then can defeat the motion for summary judgment only by identifying specific evidence of a genuine issue of material fact, *Anderson*, 477 U.S. at 248-49.

Unlawful retaliation claims under Section 1981 are analyzed under the three-step *McDonnell Douglas* framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000). First, the plaintiff must show a prima facie case that (1) plaintiff engaged in protected activity, (2) plaintiff suffered an adverse employment action, and (3) a causal connection exists between the protected

activity and the adverse employment action. *Byers*, 209 F.3d at 427. Second, if the plaintiff establishes a prima facie case, the defendant must "articulate a legitimate, nondiscriminatory [or nonretaliatory] reason" for its activity. *Patrick v. Ridge*, 394 F.3d 315 (5th Cir. 2004). Third, if the defendant meets its burden, the plaintiff "must show that the employer's putative legitimate, nondiscriminatory reason was not its real reason, but was merely a pretext for discrimination" or retaliation. *Id.* To meet this burden, the plaintiff must show "a conflict in substantial evidence on the question of whether the employer would not have taken the action 'but for' the protected activity." *Coleman v. Jason Pharm.*, 540 Fed. Appx. 302, 304 (5th Cir. 2013) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013)); *see also Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007) ("[Plaintiff] must offer specific evidence refuting the factual allegations underlying RHA's reasons for her termination."); *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) ("[T]he plaintiff "must rebut each nondiscriminatory or nonretaliatory reason articulated by the employer").

**III. Discussion**

Rothrock alleges she was terminated because of her complaints. Assuming the first two steps of *McDonnell Douglas* are satisfied, the Court considers whether the City's proffered legitimate, nonretaliatory reasons for termination were pretext and that she would not have been terminated but for her complaints. *See Moffett v. Mississippi Dept. of Mental Health*, 507 Fed. Appx. 427 (5th Cir. 2013) (skipping to ultimate issue of pretext).

Rothrock fails to rebut each proffered reason for termination. The June 3 Notice of Indefinite Suspension (Termination) includes three allegations relating to Rothrock's failure, in her position as Fire Marshal, to file incident reports to the State Fire Marshal's Office. Doc. 45-10 at 58. Timely fire incident reports were necessary for participation in state and federal grants

programs. Doc. 45-8 at 6. The Former Fire Chief and Assistant Fire Chief testified Rothrock specifically told them they were filed, which was not true. 45-13 at 1, 45-14 at 3.  Rothrock does not deny the reports were not timely filed, nor that there were serious consequences for not filing. 45-2 at 129, 133; Doc. 45-2 at 133. The Fire Chief became aware of the failure to file in February 2008 when he received a letter from the State. 45-3 at 80. The Fire Chief then investigated Rothrock's records to determine what she had been doing instead of her assigned work and discovered she had been incurring high mileage on Fire Department vehicles to visit her boyfriend and high ($400) phone bills using a Fire Department Blackberry, mainly to send inappropriate texts to her boyfriend. After the Chief asked her to return the Blackberry, he found her attempting to erase its information by soaking its SIM card in alcohol. Doc. 45-8; *see* Doc. 45-2 at 159 (denying); Doc. 45-10 at 46 (admitting).

Rothrock's October 3, 2008 Notice of Termination sets forth a series of acts of misconduct occurring on April 11, 2008, including abandonment of a fire scene without transferring command. Doc. 45-8 at 9.  Rothrock later claimed she had properly transferred command and contained the fire before leaving the scene. 45-11 at 31. Her account is contradicted by accounts from eight firefighters and official incident records. 45-13 at 2; 45-10 at 146-165. When she left, "the fire was out of control, was not contained, and nobody was in command," with "dense brown smoke completely obscuring motorist vision on Hwy 146 . . . . one of the most dangerous and heavily traveled highways in Galveston county." 45-5 at 92. Responding to a call from the Mayor of Texas City, other firefighters rushed to the scene and ultimately required assistance from five other fire departments. *Id.* Rothrock had departed in an EMS rescue vehicle in which she responded to a medical emergency. The response was delayed because Rothrock went to the wrong address, after which she called the dispatcher to reprimand

her. The Police Department complained to the Fire Department about Rothrock's call, adding "this is ongoing with [the dispatcher] and Captain Rothrock." Doc. 45-8 at 8; Doc. 46-6 at 56. The Fire Chief reviewed the tapes and determined the dispatcher had given Rothrock the correct address at least five times. Doc. 45-5 at 76; *see* Doc. 45-2 at 184 ("Q. Do you know whether or not you were wrong to blame the dispatcher for our delayed response to that call? A. Chief Gorman says I was wrong. I do not know if I was actually wrong.") After the EMS call, Rothrock stopped at a Valero store to get ice for the firefighters at the fire scene per request. 45-6 at 50. She took the ice without paying and refused a clerk's request to notify the manager. Doc. 45-8 at 125; *see* 45-5 at 78 (denying); 45-2 at 181 (admitting). On learning she had not paid for the ice, another firefighter returned to the store and paid with his personal debit card. Doc. 45-10 at 103.

The October 10, 2008 Notice of Termination alleges that Rothrock failed to obey orders and to respond to a legal subpoena. Doc. 45-8 at 10. The October 15, 2008 Notice of Termination alleges insubordination and failure to comply with investigation into extended sick leave. Doc. 45-8 at 11. The record suggests Rothrock refused to respond to calls, emails, and notices, even when a notice was presented in person to her boyfriend at her house and taped to her door. Doc. 45-11 at 15. When called from a number she did not recognize, the City's attorney alleges she "feigned incoherency." *Id.* In a meeting with an employment attorney hired to investigate her own complaints, she was "extremely confrontational," Doc. 45-15 at 2. The attorney testified, "I was shocked that she acted in such an aggressive, rude and insubordinate manner toward her superior, the Fire Chief. Her actions, tone and demeanor were entirely inappropriate for the workplace, much less appropriate towards her superior." *Id.* The record is replete with such testimony. Doc. 45-14 at 15; Doc. 45-11 at 59; Doc. 46-11; Doc. 45-8 at 12

(complaints from the public of repeated rude treatment and "harsh and dictatorial" conduct during inspections of foster home and elementary school; ongoing complaints from neighbor about harassment and threatening behavior); Doc. 45-14 at 45 (Internal Affairs Investigation stating "Captain Rothrock has a strong personality and sometimes, according to the tape recordings reviewed by Investigators, gets loud and forceful with her voice."). Rothrock denies the allegations. Doc. 45-10 at 108 ("I have never yelled at the fire chief or been insubordinate or been disrespectful to anyone.").

Rothrock offers limited evidence of racial discrimination in support of her claim that Defendants' grounds for termination were pretext. Her hiring was celebrated as the culmination of ten years of planning and recruitment by the City in order to increase diversity. Doc. 46-7. The Department had negotiated with the Union to modify the hiring criteria and had distributed thousands of flyers and posters featuring minority firefighters to convenience stores, colleges, and churches. *Id.* Rothrock was allowed to retake the physical test using a test intended for "gender and ethnic parity." Doc. 45-2 at 360. She was also given a waiver of disqualification for a prior assault conviction. Doc. 46-4; Doc. 45-2 at 342.

At first, Rothrock proved to be a capable firefighter. She was promoted three times, reaching the rank of captain. Doc. 45-2 at 367. On her first promotional exam in October 2004, she received the highest score out of eleven firefighters. Doc. 46-9. On her second promotional exam in October 2006 to the rank of captain, she received the second highest score out of five engineers. Doc. 47-2. In December 2004, in a letter to the Board of Pardons and Paroles, the Fire Chief wrote Rothrock had "proven to be one of the finest employees of the Texas City Fire Department in all facets. Her dedication and commitment to public service is personified in her desire for excellence and self-achievement having become the first woman promoted to the rank

of fire engineer through the civil service testing procedure." Doc. 46-16.

In spite of her early successes, Rothrock experienced a backlash from other firefighters. In 2004, after her first promotional exam, another firefighter was reprimanded for spreading a rumor that Rothrock and two other minority firefighters had cheated. Doc. 46-8, 46-10. Another was suspended for five days without pay for making a similar comment after her second promotional exam. Doc. 47-9. After her first promotion, Rothrock complained to the Fire Chief about a lack of respect and cooperation. Docs. 46-12, 46-14, 46-18. She also reported an incident in which male firefighters had smeared feces on the women's toilet. Doc. 46-14. The Fire Chief, who had overseen the diversity campaign, also received a vote of no confidence from the local union. Doc. 46-14. At one union meeting, Rothrock alleges she was "surrounded by her fellow fire fighters and was verbally attacked by the spewing of hateful words. During this process, the lights in the room were turned out." Doc. 46 at 12. A week later, she alleges she was "tailed" by a truck that swerved twice into her lane. Doc. 46-19. When she gestured to the driver to stop, he shot her "the bird" and laughed at her. Doc. 46 at 13 n. 7. She discovered later the driver was "best friends" with Mark Pandanell, a firefighter with whom she had an ongoing dispute. The driver apologized and she decided not to press charges. *Id.* Rothrock alleges she "couldn't sleep and became incontinent and was in fear of her life." Doc. 46 at 13. Another black female firefighter wrote to her: "I be so scared that they are going to hurt you one day at those union meetings. I would be devastated! Kelly, you don't realize how much these guys hate you. I have thought about rejoining the union just so I can be there if something does happen." Doc 49-30.

In 2005, with the support of the Fire Chief, Rothrock filed an EEOC complaint against the union. Doc 45-7 at 50. This proved to be unpopular. The union, according to Rothrock, then complained to the Fire Department that her upcoming appointment to Fire Marshal was in

violation of civil service regulations. Doc. 46 at 14. The Fire Chief, meanwhile, solicited recommendations on her behalf with the Board of Pardons & Paroles in preparation for her appointment, and the Board issued a recommendation to the Governor to grant a pardon for her prior conviction. Doc. 46-22. But the union sent a petition with twenty-nine signatories to the Governor, arguing "the anger management and self control issues that resulted in the assault charges in question have not been resolved and continue to manifest themselves. Although we are not against the Pardon itself or Mrs. Rothrock in person, the Pardon would clear the way for her to become a licensed peace officer able to carry a firearm." Doc. 46-23. A union member's wife filed a new complaint of assault against Rothrock for "staring at me threateningly" and "bumping me to one side." Doc. 46-21 at 4. The Fire Chief concluded the allegation was "opportunistic and fabricated to advance a political controversy between Rothrock and the firefighter's union." Doc. 46-21. The pardon was denied by Governor Perry. Doc. 46-28.

In June 2005, a firefighter posted an announcement for a birthday party on a bulletin board, excluding only Rothrock and another black woman:

> On June 10th we are going to celebrate Chris White's 23rd birthday at Hooters on Nasa Rd. 1 at 1930 hrs. Don't be late. He wants to drink Corona. By special request by Chris he wants just the guys and Ana to go. So shhhhhhhhhhh . . . .

Doc. 46-24. Rothrock filed a complaint with the Fire Chief and with the Texas City Human Resources Department, which employed an independent investigator to address the incident. *Id.* The investigator concluded: "In this investigator's opinion, this single incident does not create a hostile work environment. But the ongoing department atmosphere does. There are no clear perpetrators of this atmosphere, it seems to be a department-wide event." *Id.* The Fire Chief reprimanded the firefighter who posted the announcement and arranged a five-day diversity training program for the Fire Department. Doc. 46-25. By all accounts, the program was a flop.

Doc. 49-11 at 3. It was ended after one day due to hostility from firefighters, after which the facilitator visited fire stations over a period of several weeks "to build camaraderie," to no avail. Doc. 49-8 at 19. Diversity programs in 2003 and 2004 were also unsuccessful. Doc. 49-11 at 3.

Despite her struggles with other firefighters, in October 2005, Rothrock was appointed to be a Fire Marshal. Rothrock alleges that Terry Stenson, a black male firefighter, told her:

> she should give up the position and let these guys win because he had overheard them discussing in the kitchen of having [Rothrock] killed. This too was reported to the Chief. Because of the internal threats from fire fighters, on one occasion the Chief requested an officer to the scene in order to protect plaintiff during her investigation.

Doc 46 at 17 n. 13. Rothrock provides no further explanation or evidence for these allegations, nor does she specify what investigation she is referring to. In December 2006, Rothrock was promoted to captain. A series of complaints soon arose by and against Rothrock. Mark Pandanell, a white male firefighter, filed an EEOC complaint against her for sexual harassment, alleging on different occasions she exposed her breasts to him, unbuttoned her pants, and "pointed to her vagina and said 'you could have had this; oh you still can if you want it.'" Doc. 47-8; Doc. 45-3 at 23; Doc. 46 at 9. Three men including Wayne Johnson, an African American man, corroborated the allegations. Doc. 47-22. Pandanell stated, "It is well known throughout the department how much she was in love with me." Doc. 46-30. Rothrock alleges Pandanell "used to be my best friend." Doc. 45-2 at 140. Five other male firefighters filed complaints of harassment and hostile work environment against Rothrock, who was their superior officer. Doc. 46 at 20, Doc. 47-12, Doc. 45-20. The City hired an investigator, Kimmons Security Services, Inc., to investigate the various complaints by and against Rothrock. Doc. 45-3. The investigators found Rothrock did not behave in an "adult manner or professional manner" during an encounter with other firefighters. Doc. 45-3 at 51–52. Based on the investigators' report, the Fire Chief

terminated Pandanell and issued written reprimands to four male firefighters. Doc. 45-14 at 4. A month later, Rothrock made additional complaints to the new Fire Chief alleging disrespect and hostility from other firefighters, and an allegation that someone had "sabotaged her MP3 player by placing a sharp metal object inside the ear piece." Doc. 1 at 16. The City retained an employment attorney to investigate the complaints. Doc. 45-8 at 5. During the next two months, the Fire Chief received a series of external complaints about Rothrock from the State and the public, in addition to other firefighters, which are detailed in her notices of termination, described above. Doc. 45-10 at 58; Doc. 45-8 at 9; Doc. 45-8 at 10; Doc. 45-8 at 11.

Amid her litany of complaints, Rothrock provides little if any evidence of racism on the part of the City. In her Complaint, she alleges the birthday party announcement "invited [everyone] with the exception of the BLACK WOMEN." Doc. 1 at 13. This allegation misrepresents an email in the record in which Rothrock states, "I have a problem with the flyer, all but saying that everyone is allowed except the 'BLACK WOMEN.'" Doc. 46-24 at 7. The announcement does not even mention black women; nonetheless the firefighter who posted it was reprimanded and diversity training was instituted by the City as a result of Rothrock's complaint. Doc. 46-25. Similarly, Rothrock alleges in her Response that a firefighter stood up during the diversity training program and "instructed her to go back to Africa." Doc. 46 at 40. For this statement, Rothrock cites three pages from the deposition of Melvin Williams, a training facilitator with thirty years of experience running university affirmative action programs, which essentially consists of the following:

> Q. [D]id you hear—as I understand it, at some point in time, someone stood up in the meeting and made reference to an African-American female and said she needed to go back where she came from . . . in terms of the common statement, needed to go back to Africa . . . .
> A. I don't recall l that happening, but you know I was in a different mode at that point. . . .

> Q. I gathered by what you said that the hostility was of such a nature that there were actually folks willing to articulate to you that we don't have a problem. The problem is, they've hired unqualified people. Now, did I get that right, the first part?
> A. Yes. . . .
> Q. And the second part of that is what was my question is, oftentimes I've heard over the years when the reference to those unqualified people is the same reference to them folks, those people, you know, that it's been made to black folks historically. . . .
> A. I think your assessment is correct, but the individuals at that training didn't use that language as far as I—they identified the individuals. . . .
> Q. [T]hey did identify my client as one of the people they felt without using them, those, and them people, that they felt was unqualified.
> A. Yes.

Doc. 49-8 at 11–15. Here Rothrock again misrepresents the record. Rather than showing overt racism, Williams's testimony shows only that Rothrock was accused of being unqualified. Even if the alleged comment about Africa were indeed made—within the context of a City-mandated diversity program—it does not begin to raise a fact issue as to the City's grounds for termination. Under *Nassar*, none of Rothrock's allegations raise a fact issue as to whether she was terminated for her race, in light of the City's proffered reasons for termination. 133 S. Ct. at 2534. At most, Rothrock's allegations suggest inaction or ineffective response by Defendants to racial hostility among firefighters, which may indeed have contributed indirectly to Rothrock's downfall; nonetheless, the allegations fail to show pretext for retaliation. On the contrary, Rothrock admits Fire Chief Grimm "on his own initiative decided to take [Rothrock] to the EEOC to complain" against the union. Doc. 1 at 10.

      Rothrock also fails to provide evidence of different treatment for non-African American firefighters in the same or similar circumstances or in general. Ironically, two other firefighters, Jesse Rubio and Alejandro Amieva, filed EEOC complaints against the City for delaying the Captain's promotional exam so that Rothrock, as an African-American, would be eligible as a female. Doc. 47-7. Dennis Harris, a black Fire Marshal, testified, "I have never witnessed

[Defendant Gorman] doing or saying anything that causes me to think he has any racial or gender biases or prejudices at all." Doc. 45-3 at 68. Wayne Johnson, a black firefighter "with the Fire Department for many years" stated he had not observed "any type of racial discrimination" in the Department. Doc. 45-3 at 55. The 2007 investigation report concludes:

> During the two interviews with Captain Rothrock, Investigators gave her a full and fair opportunity to present evidence to substantiate allegation of discrimination or harassment on the basis of race, sex, and/or union affiliation. However, no specific information or evidence was presented to Investigators by Captain Rothrock. At the end of the two interviews, Investigators asked Captain Rothrock if she had anything to add or talk about that was not covered during the interview. Both times Captain Rothrock stated she had nothing to add. At no time during the investigation was any evidence of discrimination submitted to Investigators.

Doc. 45-3 at 57. Rothrock stated she was satisfied with the investigation. Doc. 45-2 at 91; Doc. 45-14 at 3; Doc. 45-3 at 65.

Overall, Rothrock's troubled history in the Fire Department does not present a genuine issue of material fact as to any of the City's proffered nonretaliatory grounds for termination. *See Howard v. United Parcel Serv., Inc.*, 447 Fed. Appx. 626, 630-31 (5th Cir. 2011) (granting summary judgment where numerous employees documented incidents that "[i]nstead of pretext . . . show a series of setbacks for a newly promoted manager"); *cf. Evans v. City of Houston*, 246 F.3d 344, 356 (5th Cir. 2001) (denying summary judgment where demotion occurred close in time to complaints without "*any* documentary evidence . . . to support a theory of disciplinary problems" and for reasons that were directly refuted by evidence) (emphasis in original).

IV.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion for Summary Judgment (Doc. 45) is **GRANTED** against all claims and Davis's case is **DISMISSED**

SIGNED at Houston, Texas, this 30th day of September, 2014.

                                              _____
                                                  MELINDA HARMON
                                         UNITED STATES DISTRICT JUDGE